[No. 20324-3-II. Division Two. February 20, 1998.]

CONCERNED TAXPAYERS OPPOSED TO THE MODIFIED MID-SOUTH SEQUIM BYPASS, ET AL., *Appellants*, v. THE DEPARTMENT OF TRANSPORTATION, ET AL., *Respondents*.

*Mark S. Beaufait* of *Brown & Beaufait, P.S.*, for appellants.

*Christine O. Gregoire, Attorney General,* and *Anne L. Spangler, Assistant,* for respondents.

*Lawrence C. Watters* on behalf of Washington Trust for Historic Preservation, amicus curiae.

ARMSTRONG, J. — The Washington State Department of Transportation (DOT) has long planned to build a bypass for State Route 101 around downtown Sequim. As required by the State Environmental Policy Act, the DOT prepared an Environmental Impact Statement (EIS), which was presented in its final form (FEIS) to the Transportation Commission to get approval of the project. The FEIS presented four alternative routes, with the Modified Mid-Southern route favored. Although the present project is funded for only a two-lane highway, all of the alternatives were for four-lane highways. The DOT stated in the FEIS that the remainder of the project, expanding the bypass to four lanes, would be constructed "as warranted and as money is available."

The Commission approved the proposal and Concerned Taxpayers Opposed to the Modified Mid-South Sequim Bypass (CTO) then filed this action challenging the adequacy of the FEIS on two grounds: (1) the FEIS failed to present two-lane alternatives to the four-lane highway and no-action options considered, and (2) the FEIS failed to adequately identify and discuss the impact of the highway on historical and cultural sites, most notably the Hyer

Farm, which is owned by the Sherk family and located on Grant Road south of Sequim. The trial court ruled that the FEIS was adequate and that the Transportation Commission was sufficiently informed when it made its decision in favor of the Modified Mid-Southern route. We agree and, therefore, affirm.

The State Environmental Policy Act (SEPA) requires that every state agency:

> Include in every recommendation or report on proposals for legislation and other major actions significantly affecting the quality of the environment, a detailed statement by the responsible official on:
>
> (i) the environmental impact of the proposed action;
>
> (ii) any adverse environmental effects which cannot be avoided should the proposal be implemented;
>
> (iii) alternatives to the proposed action . . . .

RCW 43.21C.030(c). This report is known as the Environmental Impact Statement (EIS).

▮▮ EIS adequacy is a question of law subject to de novo review. *Leschi Improvement Council v. Highway Comm'n*, 84 Wn.2d 271, 285, 804 P.2d 1 (1974). To be adequate, the EIS must present decision makers with a "reasonably thorough discussion of the significant aspects of the probable environmental consequences" of the agency's decision. *Cheney v. City of Mountlake Terrace*, 87 Wn.2d 338, 344-45, 552 P.2d 184 (1976) (quoting *Trout Unlimited v. Morton*, 509 F.2d 1276, 1283 (9th Cir. 1974)). Adequacy is judged by the "rule of reason," *Cheney*, 87 Wn.2d at 344, a "broad, flexible cost-effectiveness standard," and is determined on a case-by-case basis, considering "all of the policy and factual considerations reasonably related to SEPA's terse directives." Richard L. Settle, The Washington State Environmental Policy Act: A Legal and Policy Analysis § 14(a)(i), at 155-56 (4th ed. 1993). The decision of a governmental agency as to the adequacy of an EIS is accorded "substantial weight." RCW 43.21C.090; *Klickitat County Citizens Against*

*Imported Waste v. Klickitat County*, 122 Wn.2d 619, 633, 860 P.2d 390, 866 P.2d 1256 (1993). Finally, we review the state agency's determination of EIS adequacy, not the determination of the trial court. *Klickitat County*, 122 Wn.2d at 633.

TWO LANE AND COUPLET ALTERNATIVES

CTO argues that the proposed project is not a four-lane highway, but a two-lane highway to which the remaining two lanes will be added "as warranted and as money is available." Because of this, according to CTO, the FEIS is deficient for failing to include two-lane highway and couplet[1] alternatives through Sequim. The State counters that it is "irretrievably committed" to eventually building the four-lane road.

■ The standards for what alternatives must be discussed in an EIS are set forth in WAC 197-11-440(5):

> (b) Reasonable alternatives shall include actions that could feasibly attain or approximate a proposal's objectives, but at a lower environmental cost or decreased level of environmental degradation.

> (i) The word "reasonable" is intended to limit the number and range of alternatives, as well as the amount of detailed analysis for each alternative.

In addition, "an EIS is not a compendium of every conceivable effect or alternative to a proposed project, but is simply an aid to the decision making process." SETTLE, *supra*, § 14(a)(i), at 157.

The State points out that, as part of the EIS process, an "Interdisciplinary Team" examined six alternatives for widening existing roads and three couplet alternatives before selecting the final route. One couplet alternative made it to the "second round" of screening and received extensive analysis in the Transportation Expertise Report.

---

[1]A couplet is a series of one-way streets designed to speed traffic flow through a metropolitan area.

This couplet alternative was found to be deficient in meeting the traffic and safety concerns in comparison with a four-lane bypass.

■ ■ Moreover, if the State presented two-lane alternatives and later built the four lanes contemplated, it would be "piecemealing," a disfavored process. *See Cathcart-Maltby-Clearview Community Council v. Snohomish County,* 96 Wn.2d 201, 210, 634 P.2d 853 (1981).[2] The only other choice for the State would be to delay the project until funding for the entire four-lane bypass is available. But this would cause more years of delay and deprive the public of the benefits of a bypass, even though only two lanes, in the interim. We believe that the "flexible cost-effectiveness standard," *Citizens Alliance to Protect our Wetlands v. City of Auburn,* 126 Wn.2d 356, 362, 894 P.2d 1300 (1995), contemplated by the rule of reason, authorizes the procedure followed by the State here. We conclude, therefore, that the FEIS was not deficient for presenting only four-lane alternatives.

---

[2]Piecemealing is the practice of conducting environmental review only on current segments of public works projects and postponing environmental review of later segments until construction begins. This practice is disfavored because the later environmental review often seems merely a formality, as the construction of the later segments of the project has already been mandated by the earlier construction.

Furthermore, WAC 197-11-055(2)(a)(i) states "[t]he fact that proposals may require future agency approvals or environmental review shall not preclude current consideration, as long as proposed future activities are specific enough to allow some evaluation of their probable environmental impacts."

WAC 197-11-060(3)(b) dictates that:

Proposals or parts of proposals that are related to each other closely enough to be, in effect, a single course of action shall be evaluated in the same environmental document. Proposals or parts of proposals are closely related, and they shall be discussed in the same environmental document, if they:

. . . .

(ii) Are interdependent parts of a larger proposal and depend on the larger proposal as their justification or for their implementation.

Phased review of a project is inappropriate where it would serve only to avoid discussion of cumulative impacts. *See Indian Trail Property Owners Ass'n v. City of Spokane,* 76 Wn. App. 430, 443, 886 P.2d 209 (1994).

CULTURAL AND HISTORICAL IMPACTS

CTO also complains that the FEIS inadequately analyzed the impact of the project on historical resources, specifically the Hyer Farm. CTO argues that the "quality" of the cultural resources is not analyzed, and that no description of the impacts or possible mitigation of impacts on cultural resources is given.

Specifically, CTO argues that the FEIS does not address the quality of the historic resource of the Hyer Farm and fails to describe in detail the impacts of the four alternative routes on the farm. CTO points to language in the Cultural Resources section of the FEIS that the Modified Mid-Southern Alternative will "potentially affect the John Hyer Farm," described only as "an intact early twentieth century farmstead" that "appear[s] eligible for inclusion in the National Register of Historic Places." Further, continues CTO, the FEIS reports only that mitigation measures would be considered "[o]nce the preferred alternative is selected," and that "[p]roperties with possible historic significance will be noted and photographed."

We first consider whether the FEIS adequately describes the farm as a cultural resource. The DOT commissioned Craig Holstine to prepare a report on the Hyer Farm. Holstine described the farm, including its cultural significance, as:

> Situated on the east side of Grant Road on the upper terrace overlooking the Dungeness River, the John Hyer Farm consists of an intact early twentieth century farmstead. Built ca. 1925, the clapboard Craftsman style bungalow, red frame barn with high gable roof, and numerous frame outbuildings comprise what appears to be one of the few, if not the only, complete assemblages of historic-era farm buildings in the project area. John Hyer, a railroad employee, reportedly built most of the structures with wood cut from the property and milled at the sawmill that stood on the terrace adjacent to the Dungeness River below the farm.

This adequately describes the cultural significance of the Hyer Farm.

 Although referred to a number of times in the

FEIS, the Holstine report was apparently not formally incorporated into it.[3] The parties, however, agree that the Holstine Report was circulated with the FEIS[4] and was considered by the commission. We review procedural errors during the EIS process under the rule of reason and where such errors are of no consequence, they must be dismissed. *Klickitat County*, 122 Wn.2d at 637-38. The failure to formally incorporate the Holstine report is such an error. In dealing with other procedural errors, we have held adequate EISs that did not discuss a county's modified comprehensive plan, as required, because in each case the decision-makers were aware of the effect of the comprehensive plan on the project. *Toandos Peninsula Ass'n v. Jefferson County*, 32 Wn. App. 473, 483, 648 P.2d 448, (1982); *Mentor v. Kitsap County*, 22 Wn. App. 285, 290-91, 588 P.2d 1226 (1978).

We next consider whether the FEIS adequately describes the impacts to the farm from the four alternative routes. Admittedly, the FEIS does not describe in words the impacts of the four routes, stating only that the Modified Mid-Southern Alternative, for example, will "potentially affect the John Hyer Farm." But the FEIS contains detailed maps showing that three of the alternative routes will pass over the farm and its buildings, which are shown on the maps. The maps demonstrate that for these three alternatives, the buildings, if not moved, will be destroyed. The

[3]WAC 197-11-635, titled Incorporation by reference - Procedures, provides:

(1) Agencies should use existing studies and incorporate material by reference whenever appropriate.

(2) Material incorporated by reference (a) shall be cited, its location identified, and its relevant content briefly described; and (b) shall be made available for public review during applicable comment periods.

[4]The Holstine Report was part of a volume of Expertise Reports produced in conjunction with the EIS. These expertise reports, distributed under a cover sheet bearing the same project title as the FEIS, were made available to the public at the DOT Project Office in Port Angeles, at the Design Office in Olympia, at the Olympic Region Office in Tumwater, and at the Sequim and Port Angeles Public Libraries.

fourth alternative route will not pass over the Hyer Farm at all. Thus, the Commission had sufficient information to choose between the route that by-passed the farm entirely or one of the three routes that destroyed the buildings or required them to be moved.

In *Citizens Alliance v. Auburn*, 126 Wn.2d 356, the court held adequate an FEIS that described the impact to an already severely congested traffic pattern as making it worse and having a substantial impact. Here, the maps demonstrated that three of the four alternative routes would have a substantial impact on the Hyer farm, either destroying it altogether or requiring the buildings to be moved. We conclude that under the rule of reason the FEIS adequately disclosed and discussed the impacts of the alternative routes on the Hyer Farm.

Finally, CTO faults the FEIS for its failure to give "possible mitigations," but does not further discuss the issue or cite authority for its short, conclusory statement. An appellate court need not consider issues that are not supported by argument or authority. *American Legion Post No. 32 v. City of Walla Walla*, 116 Wn.2d 1, 7, 802 P.2d 784 (1991). We, therefore, decline to address the issue.

We affirm.

SEINFELD and HUNT, JJ., concur.