
# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| CASCADE BICYCLE CLUB, a Washington non-profit corporation, FUTUREWISE, a Washington non-profit corporation, and SIERRA CLUB, a California non-profit corporation, | ) ) ) ) ) ) ) ) | NO. 67549-4-I<br><br>DIVISION ONE<br><br>PUBLISHED OPINION |
| Appellants, | ) ) | |
| v. | ) ) | |
| PUGET SOUND REGIONAL COUNCIL, a state regional transportation planning organization and a federally designated metropolitan planning organization, | ) ) ) ) ) ) ) ) | |
| Respondent. | ) ) ) | FILED: July 22, 2013 |

LEACH, C.J. — Cascade Bicycle Club, Futurewise, and Sierra Club appeal the trial court's dismissal of their challenge to the regional transportation plan adopted by the Puget Sound Regional Council (PSRC) for King, Kitsap, Pierce, and Snohomish Counties. They assert that the plan must, but does not, comply with RCW 70.235.020(1)(a), which sets specific greenhouse gas emissions reduction requirements for the state of Washington. They also assert that the plan's environmental impact statement fails to comply with the State

Environmental Policy Act (SEPA)[1] because it fails to consider an alternative that would meet the statutory reduction requirements, fails to make required disclosures, and fails to consider available mitigations.

Our legislature and governor have recognized Washington's vulnerability to climate change and global warming by setting ambitious goals for reducing the total emission of greenhouse gases. With dramatic growth forecast for the Puget Sound region, the path to achieving these goals remains unclear. Because the transportation sector contributes about half of current greenhouse gas emissions, one could reasonably expect that the transportation planners for the PSRC would play a leading role in identifying political, financial, technological, and developmental strategies that could actually achieve the state's stated goals. And they have.

After years of gathering information and taking public comment, the PSRC adopted a plan that describes a "preferred alternative": moving toward user fees and away from gas taxes, altering land use patterns so as to make growth more compact, increasing transit service and making it more accessible to walkers and cyclists, improving the highways and ferry system, and using information technology to make the entire system more efficient and reduce unnecessary travel. But as the plan itself admits, even if this preferred alternative becomes a

---

[1] Ch. 43.21C RCW.

reality, emissions from surface transportation will continue to rise above baseline levels and the Puget Sound region will not meet overall state goals. Major technological changes that do have the potential to actually achieve the state's goals for reducing emissions in the Puget Sound region—for example, improvements to vehicles and fuels—are beyond the scope of a regional transportation plan.

Our resolution of this appeal demonstrates that the current statutory framework does not require that the PSRC adopt a transportation plan for the Puget Sound region that achieves its proportional share of the state's goals for reducing greenhouse gas emissions. Because the plan is not required to comply with RCW 70.235.020(1)(a) and the environmental impact statement complies with SEPA's requirements, we affirm.

## FACTS

In 1998, various units of general government in King, Kitsap, Pierce, and Snohomish Counties, including the counties, entered into an interlocal agreement to create a regional planning agency known as the PSRC. The agency's mission is to preserve and enhance life in the central Puget Sound area. PSRC is funded through a combination of state and federal grants, dues from PSRC members, and other local sources.

Under federal law, PSRC has been designated the metropolitan planning organization for King, Kitsap, Pierce, and Snohomish Counties.[2] As a metropolitan planning organization, it must develop long-range transportation plans and transportation improvement programs for its metropolitan planning area to guide the funding and development of future transportation projects.[3] PSRC's metropolitan planning area consists of the 4 counties, more than 70 cities and towns within the region, 4 port districts, the region's transit agencies, the Washington State Department of Transportation, the Washington Transportation Commission, the Muckleshoot Indian Tribal Council, and the Suquamish Tribe.

Under state law, PSRC is the regional transportation planning organization (RTPO) for the same four-county area.[4] An RTPO is formed through the "voluntary association of local governments within a county, or within geographically contiguous counties."[5] Among other duties, the RTPO must coordinate with the Department of Transportation, transportation providers, ports, and local governments within the region to prepare a regional transportation plan

---

[2] See 23 U.S.C. § 134(d).
[3] 49 U.S.C. § 5303(c)(1), (i)(2); see also 23 C.F.R. § 450.300-.338.
[4] See RCW 47.80.020.
[5] RCW 47.80.020.

(RTP) that is "consistent with countywide planning policies . . . with county, city, and town comprehensive plans, and state transportation plans."[6]

In 2007, Washington enacted a climate change mitigation statute,[7] which set specific greenhouse gas reduction goals for the state.[8] In 2008, it enacted a limiting greenhouse gas emissions statute,[9] which repealed the "goals" set in 2007 and reenacted them as greenhouse gas emissions reduction requirements for the state.[10] Also in 2008, PSRC adopted a regional growth strategy, VISION 2040, which includes a number of multicounty planning policies adopted under the Growth Management Act.[11] Among the policies is MPP-En-20, which addresses the region's contribution to climate change.

---

[6] RCW 47.80.023(2), .030.

[7] Ch. 80.80 RCW.

[8] Former RCW 80.80.020 (2007), repealed by LAWS OF 2008, ch. 14, § 13.

[9] Ch. 70.235 RCW.

[10] RCW 70.235.020(1)(a) establishes the following reduction requirements:

> (i) By 2020, reduce overall emissions of greenhouse gases in the state to 1990 levels;
>
> (ii) By 2035, reduce overall emissions of greenhouse gases in the state to twenty-five percent below 1990 levels;
>
> (iii) By 2050, the state will do its part to reach global climate stabilization levels by reducing overall emissions to fifty percent below 1990 levels, or seventy percent below the state's expected emissions that year.

[11] Ch. 36.70A RCW.

In 2009, Washington Governor Christine Gregoire signed Executive Order 09-05, which sought to reduce greenhouse gas emissions by, among other things, directing (1) the Department of Ecology to develop industry-specific emissions benchmarks for various industries in Washington state that may in the future be subject to a cap and trade program, (2) the Departments of Ecology, Commerce, and Transportation to assess changes in Washington's transportation fuel standards that "would best meet Washington's greenhouse gas emissions reduction targets," (3) the secretary of the Department of Transportation to work with the Departments of Ecology and Commerce to "evaluate . . . the vehicle miles traveled benchmarks established in RCW 47.01.440 as appropriate to address low- or no-emission vehicles, and develop additional strategies to reduce emissions from the transportation sector," and (4) the secretary of the Department of Transportation to work with PSRC and other regional councils to adopt RTPs to "provide people with additional transportation alternatives and choices, reduce greenhouse gases and achieve the statutory benchmarks to reduce annual per capita vehicle miles traveled in those counties with populations greater than 245,000."

In 2007, PSRC began to develop an RTP, Transportation 2040 (T2040). T2040 is a 30-year action plan to address transportation needs in the four-county region. In 2009, PSRC issued a draft environmental impact statement (EIS) for

T2040. Each appellant organization commented on this draft. PSRC issued a final EIS in 2010.

In May 2010, PSRC adopted T2040 as the federal metropolitan transportation plan and state regional transportation plan for the region. In June 2010, Cascade Bicycle Club, Futurewise, and Sierra Club (collectively "Cascade") filed this action, requesting direct review under SEPA and declaratory relief and a constitutional writ of review regarding PSRC's compliance with RCW 70.235.020(1)(a). Cascade alleged that T2040 failed to meet the greenhouse gas emissions reduction requirements in RCW 70.235.020(1)(a), which it claimed applied to PSRC. Cascade also contended that T2040 violated SEPA for several reasons. The trial court dismissed Cascade's complaint, concluding that the emissions limits in RCW 70.235.020(1)(a) do not apply to PSRC and that the EIS was adequate under SEPA. Cascade appeals.

The Snoqualmie Indian Tribe and the Tahoma Audubon Society each filed an amicus curiae brief supporting Cascade's position. The Washington State Departments of Ecology, Commerce, and Transportation filed an amicus curiae brief supporting that of PSRC.

## STANDARD OF REVIEW

This case includes an appeal from a trial court decision on a writ of review under article IV, section 6 of the Washington State Constitution. On such

appeals, we review de novo the agency tribunal's record to determine whether the administrative body's action was illegal, arbitrary, or capricious, depending on the issue presented.[12] We do not review the trial court's record.[13] Because this appeal presents a legal question concerning PSRC's interpretation of RCW 70.235.020(1)(a), we must determine whether PSRC's actions violated that statute.[14]

We also review de novo an agency decision regarding the adequacy of an EIS.[15] We give substantial weight to the agency's determination that the EIS is adequate under SEPA.[16]

ANALYSIS

Emissions Reductions in RCW 70.235.020(1)(a) Do Not Apply to PSRC

Cascade claims that T2040 violates state law because implementing this plan will not reduce greenhouse gas emissions in the applicable four-county region to the statewide standard established in RCW 70.235.020(1)(a). It supports this claim with two distinct assertions: (1) PSRC is a state agent whose

---

[12] City of Des Moines v. Puget Sound Regional Council, 97 Wn. App. 920, 925, 988 P.2d 993 (1999).
[13] City of Des Moines, 97 Wn. App. at 925.
[14] City of Des Moines, 97 Wn. App. at 925.
[15] Klickitat County Citizens Against Imported Waste v. Klickitat County, 122 Wn.2d 619, 632, 860 P.2d 390, 866 P.2d 1256 (1993) (citing Solid Waste Alternative Proponents v. Okanogan County, 66 Wn. App. 439, 441, 832 P.2d 503 (1992)).
[16] RCW 43.21C.090; Klickitat County, 122 Wn.2d at 633.

plan must comply with this statute and (2) PSRC obligated itself to comply with the statute's emissions standards by adopting VISION 2040 as its regional growth plan. Cascade's first assertion assumes that the statute requires every regional plan to produce proportional emissions reductions for the applicable geographic sector or source. Stated differently, Cascade contends that a plan applicable to only one part of the state must meet the standard established by statute for the state as a whole. Because RCW 70.235.020(1)(a) does not require proportional emissions reductions and PSRC did not agree that its planning must comply with the statute's standards, we hold that T2040 does not violate this statute.

In 2008, the Washington Legislature announced its intent to limit and reduce greenhouse gas emissions. RCW 70.235.020(1)(a) implements this intent and states, "The state shall limit emissions of greenhouse gases to achieve the following emission reductions for Washington state." Cascade claims that this language requires a transportation plan for four counties to achieve the same reductions within those counties. But the plain language of RCW 70.235.020 does not require pro rata emissions reductions. Additionally, Cascade's contention proceeds from a faulty premise—that the state can achieve a global reduction only through a pro rata reduction in each constituent part of the whole. To illustrate by analogy, this premise would require accomplishing a 15 percent

budget reduction only by paying 15 percent less for each item included in the budget. This ignores the possibility of eliminating some items from the budget or, alternatively, reducing the cost of some by more than 15 percent and others by less. Similarly, the state can achieve the mandated greenhouse gas reductions by eliminating some emission sources or, alternatively, by reducing some sources by more than the required amount and others by less. Because RCW 70.235.020 requires only statewide emission reductions, Cascade's asserted pro rata application of this statute fails.

Cascade points to RCW 70.235.050(1) to bolster its argument. This statute states, "All state agencies shall meet the statewide greenhouse gas emission limits established in RCW 70.235.020 to achieve the following . . . ." Cascade contends that this provision requires that every action by a state agency, including a transportation plan adopted by PSRC, must meet these emission limits. But the legislature's statement of its intent undermines Cascade's position and demonstrates that RCW 70.235.050 applies only to emissions produced by an agency's own operations.

The legislature adopted RCW 70.235.050 as Laws of 2009, chapter 519, section 2. The legislature described chapter 519 as "AN ACT Relating to state agency climate leadership," and section 1 of chapter 519 states,

> The legislature finds that in chapter 14, Laws of 2008, the
> legislature established greenhouse gas emission reduction limits for

> Washington state, including a reduction of overall emissions by 2020 to emission levels in 1990, a reduction by 2035 to levels twenty-five percent below 1990 levels, and by 2050 a further reduction below 1990 levels. Based upon estimated 2006 emission levels in Washington, this will require a reduction from present emission levels of over twenty-five percent in the next eleven years. <u>The legislature further finds that state government activities are a significant source of emissions, and that state government should meet targets for reducing emissions from its buildings, vehicles, and all operations that demonstrate that these reductions are achievable, cost-effective, and will help to promote innovative energy efficiency technologies and practices.</u>

(Emphasis added.)

The legislature's very specific statement of intent for RCW 70.235.050 strongly supports our conclusion. The legislature stated that this statute's purpose is to reduce emissions from state agency operations, including buildings and vehicles used in those operations, to demonstrate the reductions' feasibility, and to promote innovation. By the imposition of emission standards upon state agency operational activities, the legislature did not intend to impose those standards upon every other state agency action. RCW 70.235.050 does not require a future development plan adopted for a discrete region of the state, which addresses nonoperational government action and the public's transportation activities, comply with statewide greenhouse gas emission standards.

Additional factors indicate that the legislature did not intend to impose pro rata emission limits. RCW 70.235.050, which Cascade concedes does not apply

to PSRC directly, requires that state agencies meet specific emissions reduction requirements, and RCW 80.80.040 sets greenhouse gas emissions performance standards for energy plants. These provisions demonstrate that where the legislature wanted to require proportionate reductions, it plainly said so.

Second, Executive Order 09-05, signed by the governor after the legislature passed RCW 70.235.020, contains specific directives to the Departments of Ecology, Commerce, and Transportation to address sector-specific approaches to reduce emissions. It also contained a specific directive to PSRC. This suggests that the governor understood that the statute did not require sector-specific measures.

In addition, PSRC's planning is limited to on-road vehicles. It does not include freight rail, commercial or military aircraft, truck movements at industrial facilities, cargo handling equipment, or oceangoing vessels. The Department of Ecology has identified three means of reducing emissions from on-road vehicles: reducing vehicle miles traveled (VMT), increasing the use of clean fuels, and increasing the use of clean vehicles. PSRC's jurisdiction extends only to VMT reduction. Cascade would require that all of the emissions reductions for on-road vehicles come from VMT reduction, ignoring the other two recognized methods of achieving this goal. Cascade offers no persuasive explanation why RCW 70.235.020 requires this approach.

-12-

Finally, the Departments of Ecology, Commerce, and Transportation, in their amicus curiae brief, state clearly that the statute does not require proportional reductions. We agree.

Cascade concedes that PSRC is not a state agency for the purposes of both RCW 70.235.050 and the Washington Administrative Procedures Act.[17] But it claims that T2040 must comply with the statutory greenhouse gas limits because PSRC "has the same obligations and responsibilities as its constituent members, which include agencies and subdivisions of the state." Cascade argues that PSRC's members "do not insulate themselves from state directives through the formation of an interlocal agency." Because of our construction of RCW 70.235.050, we do not address this argument.

Cascade also claims that PSRC "independently committed itself to compliance with [greenhouse gas] reductions of [RCW] 70.235.020(1)(a)." It maintains, "While state law does not compel the PSRC to do so, the PSRC is free to adopt policies committing the region to compliance with the same [greenhouse gas] reductions applicable to the state as a whole." RCW 47.80.023(2) requires the RTP to be consistent with adopted countywide policies. VISION 2040—PSRC's regional growth management strategy—adopted a series of multicounty planning policies. One of these policies, MPP-En-20, states,

---

[17] Ch. 34.05 RCW.

"Address the central Puget Sound region's contribution to climate change by, at a minimum, committing to comply with state initiatives and directives regarding climate change and the reduction of greenhouse gases." T2040 states that it "commits to supporting a heightened awareness of the relationship between transportation and the environment, consistent with the regional environmental sustainability framework established by VISION 2040." From this statute and these statements, Cascade reasons as follows: (1) Vision 2040 establishes a commitment to comply regionally with the statewide greenhouse gas emission limits; (2) because PSRC adopted this policy, RCW 47.080.023(2) requires that T2040 be consistent with it; and (3) to be consistent, T2040 must comply with the statutory greenhouse gas emissions limits.

We disagree. VISION 2040 includes 21 separate general policies that address climate change, reducing greenhouse gas emissions or related environmental impacts. It also contains a series of "actions" developed to implement the environmental policies, such as MPP-En-20. The "action" for climate change is En-Action-7, which states,

> The Puget Sound Regional Council and its member organizations will work with the Puget Sound Clean Air Agency, state agencies, and other environmental professionals to prepare an action plan containing regional and local provisions. The plan should investigate ways to: (a) address climate change in accordance with the Governor's 2007 Climate Change initiative and state legislation on greenhouse gas emissions reduction (RCW 80.80.020), (b) reduce greenhouse gas emissions, and (c) take specific mitigation

-14-

steps to address climate change impacts. The plan should also address establishing a regional climate change benchmark program.

None of the relevant policies or actions in VISION 2040 adopts specific greenhouse gas emission limits. PSRC did not agree to comply voluntarily with RCW 70.235.020 by adopting VISION 2040.

Additionally, PSRC complied fully with En-Action-7 by producing a plan that includes the necessary "investigations." We decline Cascade's invitation to read a single sentence from VISION 2040 in isolation without regard to its context or the plan's overall purpose and the multiple polices described in VISION 2040. T2040 is consistent with VISION 2040 when viewing that plan comprehensively.

The EIS Was Adequate under SEPA

Cascade contends that T2040 violates SEPA because the EIS prepared for the plan (1) fails to identify the extent of T2040's violation of the statutory greenhouse gas emissions reduction requirements, (2) fails to disclose T2040's inconsistency with VISION 2040, and (3) fails to develop alternatives or mitigations fully compliant with the statutory greenhouse gas emissions limits. The record does not support these arguments.

We examine the legal sufficiency of the environmental data contained in an EIS to determine whether the EIS is adequate under SEPA.[18] We test EIS

_____

[18] Klickitat County, 122 Wn.2d at 633.

adequacy according to the "rule of reason."[19] The EIS must present decision makers with a "'reasonably thorough discussion of the significant aspects of the probable environmental consequences' of the agency's decision."[20] An EIS aids the decision-making process and need not address every conceivable effect or alternative to a proposed project.[21] "'[T]he EIS need include only information sufficiently beneficial to the decision-making process to justify the cost of its inclusion. Impacts or alternatives which have insufficient causal relationship, likelihood, or reliability to influence decisionmakers are "remote" or "speculative" and may be excluded from an EIS.'"[22]

Cascade claims that PSRC's discussion of the statutory emissions reductions in the EIS was inadequate because PSRC's "failure to disclose the Plan's violation of [the greenhouse gas] reduction requirements conceals the extent to which the preferred alternative places the region and the state on a direction that grossly departs from the goal of achieving climate stabilization." It argues that additional greenhouse gas discharges beyond the statutory levels represent irreversible and irretrievable commitments of resources and pose long-

---

[19] Klickitat County, 122 Wn.2d at 633.

[20] Klickitat County, 122 Wn.2d at 633 (internal quotation marks omitted) (quoting Cheney v. Mountlake Terrace, 87 Wn.2d 338, 344-45, 552 P.2d 184 (1976)).

[21] Klickitat County, 122 Wn.2d at 641.

[22] Klickitat County, 122 Wn.2d at 641 (quoting RICHARD L. SETTLE, THE WASHINGTON STATE ENVIRONMENTAL POLICY: A LEGAL AND POLICY ANALYSIS § 14(a), at 157 (4th ed. 1993)).

term risks to the environment, including impacts on air quality, climate, and public health.[23] Cascade also asserts that because PSRC voluntarily adopted the reduction requirements in RCW 70.235.020(1)(a) when it adopted VISION 2040, PSRC's failure in the EIS to disclose T2040's noncompliance with those requirements conflicts with WAC 197-11-440(6)(d)(i). That rule requires that an EIS include how the proposed action is "consistent and inconsistent" with existing plans.

Cascade's appeal is limited to PSRC's failure in the EIS to disclose an alleged statutory violation; Cascade makes no claim that the EIS otherwise fails to adequately describe or disclose the potential environmental impacts of T2040. As discussed above, RCW 70.235.020(1)(a) does not require that a regional plan meet the global state emission limits. Because no statutory violation exists, Cascade's argument fails.

Cascade also claims that the EIS violates SEPA because it does not identify and analyze alternatives and mitigations capable of attaining the greenhouse gas emission limits established in RCW 70.235.020(1)(a). Cascade points to projections that PSRC prepared in 2008 and alleges, "[B]y the year 2030 [greenhouse gas] reductions of up to 47% of 1990 emission levels could be attained through a combination of increased fuel efficiency, reduced carbon

---

[23] See WAC 197-11-440(6)(c)(ii).

content and a 30% reduction in per capital [sic] vehicle miles traveled." It then argues, "For whatever reason, PSRC abandoned efforts to develop an alternative that would be consistent with these projections."

When preparing an EIS, an agency must describe the proposal as well as reasonable alternative courses of action.[24] "Reasonable alternatives shall include actions that could feasibly attain or approximate a proposal's objectives, but at a lower environmental cost or decreased level of environmental degradation."[25] "The word 'reasonable' is intended to limit the number and range of alternatives, as well as the amount of detailed analysis for each alternative."[26] Notably, "[r]easonable alternatives may be those over which an agency with jurisdiction has authority to control impacts either directly, or indirectly through requirement of mitigation measures."[27]

Because T2040 is a nonproject proposal, the EIS is a nonproject final EIS under WAC 197-11-442. As such, WAC 197-11-060(3)(a)(iii) encouraged PSRC, in developing T2040, to describe its proposal "in terms of objectives rather than preferred solutions." For this nonproject proposal, PSRC has more flexibility in preparing an EIS because "there is normally less detailed information available

---

[24] WAC 197-11-440(5)(a).
[25] WAC 197-11-440(5)(b).
[26] WAC 197-11-440(5)(b)(i).
[27] WAC 197-11-440(5)(b)(iii).

on their environmental impacts and on any subsequent project proposals."[28] The EIS must discuss impacts and alternatives "in the level of detail appropriate to the scope of the nonproject proposal and to the level of planning for the proposal. . . . In particular, agencies are encouraged to describe the proposal in terms of alternative means of accomplishing a stated objective."[29] The discussion of alternatives "shall be limited to a general discussion of the impacts of alternate proposals for policies contained in such plans, for land use or shoreline designations, and for implementation measures."[30] Additionally, it needs to address "reasonable mitigation measures" that would "significantly mitigate" the impacts of alternative courses of action, as well as the proposed action.[31]

Although RCW 70.235.020(1)(a) does not impose its requirements upon PSRC, PSRC addresses its inability to singlehandedly meet the statutory emissions limits. The EIS specifically identifies the statutory emission reduction levels and states, "These goals are statewide reduction goals, across all sectors and sources of emissions. While these goals are enacted in state law, the state has not yet assigned targets for the regions of the state, or for individual sectors (transportation, energy, housing, etc.)." Chapter 70.235 RCW did not amend

---

[28] WAC 197-11-442(1).
[29] WAC 197-11-442(2).
[30] WAC 197-11-442(4).
[31] WAC 197-11-440(6)(a).

SEPA, and RCW 70.235.020(1)(a) contains no proportional reduction requirement applicable to PSRC. T2040 contains 13 objectives, which are not limited to addressing climate change. In fact, only two of them specifically mention climate change. T2040 includes a baseline alternative plus six action alternatives, including a preferred alternative. Cascade overlooks PSRC's limited jurisdiction and that the RTP cannot address emission levels for emission sources throughout Washington state not subject to its authority.

T2040 contains a four-part greenhouse gas reduction strategy. This includes measures for changes in land use, user fees, transportation choices, and technological improvements such as improving fuel efficiency and increasing availability of alternative fuel vehicles. In the EIS, PSRC discusses alternatives in T2040 over which it has jurisdiction, including land use, user fee, and transportation choice strategies, to reduce greenhouse gas emissions. At the same time, it recognizes that its inability to determine the region's future vehicle and fuel technologies limits its capacity to reduce emissions below 2006 baseline levels.

In developing the preferred alternative for T2040, PSRC identified "areas of potential controversy and uncertainty," such as future land use assumptions, climate change and greenhouse gas emissions, qualitative versus quantitative analysis methods, and impacts to low income and minority populations. PSRC

acknowledges that it used a 2006 baseline to measure greenhouse gas reductions, rather than the 1990 baseline used in RCW 70.235.020(1)(a). The EIS states expressly that due to the noted uncertainties and difficulties, including challenges in calculating a 1990 baseline as well as in determining what portion of the emissions reduction the transportation sector and the central Puget Sound region should bear, "it is not possible to state with certainty whether the transportation sector in the central Puget Sound region would be able to reach the 1990 greenhouse gas reduction goals set by the state of Washington." The EIS clearly identifies the factors that prevent PSRC from determining if any T2040 alternative would reach the statutory emissions levels.

None of the alternatives alone would reduce greenhouse gases to the levels that RCW 70.235.020(1)(a) requires. In response to comments on the draft EIS, PSRC tested additional strategies to reduce greenhouse gas emissions. The agency collaborated with the Department of Ecology to develop a "likely" and an "aggressive" technology scenario regarding improved vehicle and fuel technologies. The region's vehicle and fuel technological advancement is not subject to PSRC's planning process. This makes it difficult for the agency to develop alternatives that account for such improvements. PSRC explains that technological advancements could reduce emissions for all alternatives below the 2006 baseline levels. But, as discussed above, "solely from within the

context of long-range transportation planning," it is difficult to state conclusively that the transportation sector in the central Puget Sound region could reach the statutory emissions reductions because of comparison challenges and uncertainties about the geographic and sector emissions distributions. Even though PSRC is not obligated on its own to meet the emissions reduction levels in RCW 70.235.020(1)(a), it sufficiently addresses its measures intended to help reach those emissions levels, as well as obstacles and the necessary collaboration for meeting them. Under the "rule of reason," each of the proposed alternatives in the final EIS represents actions that could feasibly attain T2040's objectives while reducing the transportation sector's environmental impact, considering PSRC's available resources and its limited jurisdiction.

PSRC's four-part greenhouse gas strategy aims to reduce the environmental impact of on-road vehicles in the region. Cascade acknowledges this strategy and does not dispute its validity. The mitigation measures in the EIS must relate to the environmental impacts that the EIS specifies, not to alleged violations of an inapplicable statute.[32] Because the EIS adequately considers reasonable alternatives to the "preferred alternative" and it adequately discusses significant environmental impacts of the proposed alternatives, the mitigation measures need only address those impacts. As a nonproject final EIS, the EIS

---

[32] WAC 197-11-440(6)(a).

defines alternatives and evaluates environmental effects at a relatively broad level. It then explains, "More detailed project-specific environmental review will be developed as appropriate in the future for projects identified in the Transportation 2040 plan that are selected for implementation by their sponsors: Washington State Department of Transportation (WSDOT), transit agencies, counties, and cities."

We repeat our observation in City of Des Moines v. Puget Sound Regional Council[33] that PSRC is a mere planning agency that has authority only to adopt planning policies in various forms. Even though PSRC is not required to include specific mitigation measures in the RTP, a "dire prediction that mitigation will never be undertaken because it has not been specifically imposed by the PSRC's authorization for further planning is unfounded."[34] The interlocal agreement establishing PSRC indicates that the RTP forms a basis for state and local transportation planning. Agencies with permitting authority are responsible for imposing project-specific mitigation measures.[35]

The EIS states,

All plan alternatives are intended to support and be consistent with VISION 2040, with the following objectives: to serve regional growth, improve mobility, preserve the existing system, and mitigate potential impacts associated with urban growth.

---

[33] 97 Wn. App. 920, 927-28, 988 P.2d 993 (1999).
[34] City of Des Moines, 97 Wn. App. at 928.
[35] City of Des Moines, 97 Wn. App. at 927-28.

> Nevertheless, implementation of any of the alternatives would likely cause a range of impacts. There are numerous actions that the region's public agencies (and future project sponsors) could take to reduce these impacts.

It discusses possible mitigating measures at the local, regional, and state levels. The EIS identifies mitigation measures for each of the elements of the environment that it addresses, including "Air Quality and Climate Change." It explains, "All of the Transportation 2040 alternatives contain similar project types, so the mitigation measures identified would be similar for all alternatives. However, each alternative contains different quantities of new projects and programs, so the amount of mitigation required could differ by alternative." The amount of mitigation required "would likely correspond to the magnitude of impacts" for each alternative, which the EIS discusses. In the EIS, PSRC also recognizes, "With regard to the desire to reduce greenhouse gas emissions, new and yet-to-be-developed fuel technology and vehicle design may further mitigate air pollution, reduce harmful runoff, and improve water quality." PSRC sufficiently addresses reasonable mitigation measures because it not only discusses general actions for all alternatives but also acknowledges that further actions may be necessary to reduce the environmental impacts it discusses and points to specific agencies that have such authority.

Executive Order 09-05, titled "Washington's Leadership on Climate Change," contained specific directives to state agencies to make certain

assessments and to develop certain recommendations, actions, and strategies that would allow the transportation sector to reduce greenhouse gas emissions. But, at this time, the legislature has not enacted region- or sector-specific measures or standards. We cannot hold PSRC to standards that do not exist.

RCW 47.01.440 establishes statewide benchmarks to reduce annual per capita VMT. These benchmarks are not requirements. The executive order directed the Department of Transportation to evaluate the benchmarks and to work with regional councils to develop and implement RTPs to meet those benchmarks in certain counties. The EIS states that VMT per capita for light trucks and passenger vehicles in the region already meets the 2020 benchmark in RCW 47.01.440, although its assessment does not include emissions from transit vehicles. However, RCW 47.01.440 does not impose the statewide benchmark upon PSRC's four-county region.

## CONCLUSION

RCW 70.235.020(1)(a) does not require that PSRC adopt an RTP that achieves the statute's statewide greenhouse gas emissions reduction requirements because the statute does not require proportional emissions reductions. PSRC did not voluntarily commit itself to the statute's emissions reduction levels when it adopted VISION 2040. PSRC's EIS for T2040 satisfies SEPA because PSRC is not bound by RCW 70.235.020(1)(a), the EIS effectively

assesses reasonable alternative actions, and the EIS sufficiently discusses mitigation measures to reduce T2040's environmental impact. We affirm.

WE CONCUR: